IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of: | ) | No. 40489-7-III |
| | ) | |
| RACHELLE JOHNSON, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| JOSHUA JOHNSON, | ) | |
| | ) | |
| Respondent. | ) | |

MURPHY, J. — Rachelle Johnson and Joshua Johnson[1] share two children. They

divorced in 2020, with a final parenting plan entered at that time. In 2022, Rachelle filed

a petition for major and minor modifications to the parenting plan. The requested

modifications largely related to Joshua moving out of state and Rachelle's explanation of

neglect and Joshua's behaviors she alleged were harmful to her children's physical,

mental, and emotional health. Rachelle also requested sole decision-making and

limitations on Joshua's residential time pursuant to RCW 26.09.191, claiming Joshua

committed domestic violence, abusive use of conflict, and had an emotional or physical

---

[1] Because the parties share the same last name, we refer to them by their first
names for clarity. No disrespect is intended by doing so.

problem preventing him from parenting. Rachelle requested supervised visitation and an order requiring Joshua to complete a professional mental health evaluation with a parenting component, an alcohol/drug evaluation, and follow any recommended treatment. Finding adequate cause, the trial court conducted a trial on the modification requests.

After trial, the court granted the major and minor modifications, finding Joshua's relocation outside of Spokane was a substantial change in circumstances and modifications of parenting time were necessary. The court declined to award sole decision-making to Rachelle or place residential limitations on Joshua pursuant to RCW 26.09.191, finding neither parent committed domestic violence nor had problems that harmed the best interests of the children. Under the modified plan, supervised visits for Joshua were not required, but Joshua's visitation was amended to holiday weekends, four weeks in the summer, and holidays on alternating years. Joint decision-making for education and nonemergent healthcare was maintained.

Rachelle appeals, arguing the trial court abused its discretion in declining to place limitations on Joshua's residential time in light of substantial evidence that supported a finding of domestic violence, abusive use of conflict, and emotional or physical problems preventing parenting.

We affirm the trial court.

FACTS

Rachelle and Joshua married in 2010. They have two daughters. The parties separated in 2020, and an agreed parenting plan was entered on August 19, 2020. Rachelle had the children each week, with the exception of Friday from 8:00 a.m. until Monday at 8:00 a.m., when the children resided with Joshua. The parenting plan provided for an even split of residential time between Rachelle and Joshua for holidays and school breaks. The children were to be exchanged for residential time at each parent's home, with the parent responsible for transportation arrangements being the parent picking up the children. The plan imposed no restrictions on either parent. Joint decision-making was required for educational and healthcare matters. The parties were also required to attend mediation to resolve any disagreements about the parenting plan. Due to the nearly equal residential time, the parties agreed there would be no child support payment.

In May 2022, Joshua moved out of the state without formally changing the parenting plan. The parties agree that the parenting plan was not followed. A dispute between the parties arose regarding the children visiting Joshua.

In July 2022, Rachelle filed a petition to modify the parenting plan. Rachelle sought both major and minor modifications. In the petition, she claimed that Joshua lived in Maricopa, Arizona or possibly Quinlan, Texas. She requested the major modification because the children had been living with her with Joshua's permission, which was "very

3

different" from the parenting plan's provisions. Clerk's Papers (CP) at 39. She requested the minor modification because she was concurrently making a request for a major change due to the current parenting plan being "difficult to follow because the parent who has less residential time with the children has moved." CP at 39. Rachelle further requested the court limit Joshua's residential time and decision-making for the children. She also asked that the court set or change child support if her petition was granted.

Rachelle also submitted two proposed parenting plans: one that accounted for Joshua living in Spokane and one if Joshua lived out of state. Within these proposed parenting plans, Rachelle proposed that the reasons for putting parental limitations on Joshua under RCW 26.09.191 included that: (1) Joshua neglected his children by substantially refusing to perform his parenting duties, (2) he had "a long-term emotional or physical problem that gets in the way of his/her ability to parent," and (3) he engaged in abusive use of conflict. CP at 44. Rachelle requested the court allow the children to stay with her the majority of the time, and Joshua's residential time with the children be changed to supervised visits only, for four hours per day at least two times per week, until he completed mental health and drug and alcohol evaluations and treatment. Once the limitations were in place, Rachelle requested that the children stay with Joshua only on the third weekend of every month in Spokane. She sought sole decision-making about the children's education and nonemergent healthcare. Rachelle also wanted Joshua to be

4

responsible for arranging transportation during his residential time, and for pickup and drop-off to be confirmed upon Joshua's notice of intent to exercise residential time. She additionally requested child support.

Rachelle submitted a sworn declaration with her petition and described the parties' turbulent history leading up to their dissolution of marriage, claiming that through financial ups and downs, Joshua "became very mean" and was "diagnosed with bipolar, anxiety and [attention deficit hyperactivity disorder]." CP at 70. She further alleged that although medication initially helped, Rachelle suspected Joshua stopped taking the medication because he "would not or could not control his impulses." CP at 70. The extreme emotional abuse that started during their marriage continued "to this day." CP at 70.

According to Rachelle, after the final dissolution orders were entered, the parenting plan was initially followed, but Joshua then stopped taking the children on Friday, then stopped taking them on Saturday, and for the time on Sunday and Monday that he exercised, he would take the children to their agreed upon daycare provider, Rachelle's mom. In May 2022, Joshua moved to Arizona and then Texas, and would communicate to Rachelle that he would "move up to Spokane and fight [her] for custody" if she sought any change in the parenting plan. CP at 71. Rachelle articulated a fear that Joshua would take the children out of state because his "impulse control issue[s] ha[ve]

5

skyrocketed since he moved to Arizona." CP at 71. Joshua expected Rachelle to arrange for the children to fly to him and to simply have the "hope" that the children would be returned. CP at 71. Rachelle further described that Joshua told the children that she was keeping them from him.

Rachelle additionally expressed safety concerns about when her children did stay with Joshua, based on information she learned that Joshua used drugs in front of them and locked them alone in their room with a tablet as the only way to communicate with him.

Rachelle appended messages between herself and Joshua to her declaration in support of her allegations that Joshua was neglecting his children, was emotionally abusive, and had problems that impeded his ability to parent. These messages included the following comments:

● "I've already told them that you won't let them come." CP at 78.

● "[Y]ou make me sick." CP at 79.

● "Well they know it's you that's keeping them from visiting. Not me." CP at 80.

● "Im [sic] sorry those kids have you for a mom." CP at 80.

● "Your [sic] pathetic." CP at 81.

- "Can you do me a favor though and let the girls know that you're not gonna let them come and see me[?] You're a real piece of work. I'll tell them myself." CP at 82.

- "I'll tell the girls that you won't let them come and see me don't worry about it." CP at 82.

- "You're a sad and pathetic person." CP at 83.

- "You're clearly delusional." CP at 84.

- "[W]ill be in Spokane in a flash if you try and take custody away." CP at 85.

- "But I'll never pay you a dime in child support. I don't care if I have to work for cash for the rest of my life." CP at 85.

- "I'll do everything I can to make [your attorney's] job as hard as possible. So they can start charging you more." CP at 86.

- "You can't afford to fight me lol." CP at 86.

- "I'm going to make you jump through every hoop possible." CP at 86.

- "I'd even move back to Spokane if it would mean you lose and it cost you money." CP at 87.

- "Lol you're dumb." CP at 87.

At the adequate cause hearing on Rachelle's petition, the trial court entered a temporary order and set a date for a review hearing to allow the parties to provide

7

additional information, noting concerns regarding the message communications and allegations of Joshua's drug use and mental health. Joshua was ordered to take a urinalysis by a specified date with ramifications for visitation listed if this did not occur or if the results were positive. Additional information was requested from both parties about the children. Joshau was ordered to submit to a mental health evaluation, with notice to be given to Rachelle for input of collateral information. The court also ordered that any future communication by the parties about the children be exclusively through counsel and that mediation be attended as soon as possible.

Rachelle submitted additional information through another declaration, a declaration from her mother, Renee Rottacker, and Rachelle produced additional messages and e-mail correspondence between herself and Joshua. Rachelle's supplemental declaration detailed statements her daughters made regarding events in Joshua's home, extracurricular activities of the children, the concern that Joshua would not let the children attend these activities during his residential time, and the lack of Joshua's knowledge or involvement in medical care providers or teachers.

Renee Rottacker's declaration recounted her observation of Joshua telling his girls that they did not need to listen to their mother when they were with him and that only what he said mattered.

Joshua submitted an unsigned declaration. He responded to the claim about his lack of knowledge about his children's education by describing that it was not that he refused to help his girls with their school work, but that Rachelle demanded extra school work be done, and he would decide if his daughters did extra work during his residential time. He claimed Rachelle's statements that he was not involved in the children's school was "very misleading" and described the 20 plus e-mails and phone calls per day he used to receive from the elementary school, which prompted Joshua to remove his number from the system because of the "insane amount of none important e[-]mails," and the request he made of Rachelle that she notify him of special events and conferences. CP at 106.

Joshua stated that Rachelle's "inability to communicate" her "personal feelings" toward him "affect[ed] the wellbeing of [his] children for years." CP at 107. He expressed his desire to see a family counselor and engage in mediation to resolve their differences and work together "for the children instead of against each other." CP at 107. Joshua stated his willingness to help with sporting events, school supplies, clothes, food, and "anything else the girls may need," and denied all allegations of drug use or intoxication in the presence of their daughters. CP at 107. He also expressed safety concerns about their daughters being around Rachelle's significant other, who had a criminal history. Joshua noted he had the "utmost respect" for Renee Rottacker, and

9

maintained a relationship with Rottacker until the start of these court proceedings, but claimed the statement Rottacker overheard Joshua make to his children was taken out of context. CP at 108.

Joshua further declared that he was "thrilled" the court ordered mediation. CP at 107. He alleged that Rachelle made "a lot of hearsay claims" about his "daily routine, medical history, or use of marijuana" and that he was never intoxicated in front of his children. CP at 107.

Rachelle filed a reply declaration, explaining that Joshua was "not being truthful," as well as describing Joshua's felony conviction and drug use history, among other comments. CP at 120.

Joshua filed a response to Rachelle's petition and denied Rachelle's positions and statements, with the comment that the information she conveyed was "untrue and misleading" and "[t]he children are not in any danger." CP at 155.

Approximately two months later, on October 28, 2022, Rachelle sought an immediate restraining order against Joshua to protect herself and her two daughters, with a declaration in support of the same. In her declaration, she alleged Joshua had completely stopped visitation, was acting erratically, had been arrested, had lost his place to live, and had a pending domestic violence protection order filed against him by his roommate. She detailed an incident on October 21, 2022, in which she received a text

message from her mother stating Joshua was trying to "take the girls" and that the police had been called. CP at 166. Rachelle expressed that she was fearful that Joshua's current behavior would continue.

In support of the motion for restraining order, Rachelle submitted a declaration of her mother, Renee Rottacker, that detailed an incident in which Rottacker was getting her grandchildren ready for a trip to Walla Walla to see their great-grandmother, when Joshua arrived at Rottacker's residence and "started pounding on the door relentlessly." CP at 173. Rottacker did not know if Joshua would "try to forcefully take the girls" with him alternating between pounding on the door and ringing the doorbell. CP at 173. The girls were upset and "began crying and asking if they were safe." CP at 173. Joshua was told to stop pounding on the door and leave or the police would be called. The police were called. There was a back-and-forth with Joshua leaving and coming back, and the police coming and leaving, then returning. The girls were crying and remained upset.

Rachelle filed another proposed parenting plan, adding domestic violence as a reason to put parental limitations on Joshua. She requested that the court require all residential time with Joshua be supervised by a professional supervisor and that visitation only occur on Saturdays. She further requested pursuit of the already ordered mental health evaluation and asked that a domestic violence perpetrator evaluation be ordered, with Joshua bearing the costs of the evaluations and treatment.

11

The same day Rachelle filed the motion for a restraining order, Joshua filed a declaration stating he was "so tired of being attacked," and that because he could not find trusting relationships in Spokane, regardless of the outcome of any hearing, he was moving to Pierce County where he had family. CP at 168. Joshua also claimed he was "illegally removed from [his] living place and now [has] other civil matters to fight." CP at 169.

The court granted Rachelle's motion for immediate restraining order and set a hearing for November 10, 2022. After the November 10, 2022, hearing, the court entered temporary family law orders and a temporary parenting plan. The temporary parenting plan placed limitations on Joshua based on the court's findings of a history of acts of domestic violence, a long-term emotional or physical problem that gets in the way of his ability to parent, and use of conflict that may cause serious damage to the psychological development of the children. Under the temporary plan, Joshua was entitled to supervised contact only with a professional supervisor on the dates and times determined by the supervisor, with it anticipated that this would be one weekend per month for four to five hours during the daytime. There was no requirement that the visits occur in Pierce County, but if they did, that would happen only if there was supervision. The court noted it had already ordered Joshua to obtain a mental health evaluation that had not yet been done and had additionally ordered a domestic violence perpetrator evaluation, with

reevaluation of the limitations imposed on Joshua to occur once the evaluations and proof of compliance with recommended treatment was obtained. Ramifications of Joshua's violation of the terms of the parenting plan were set out. It was also ordered that Joshua would have video calls with the children each Monday, Thursday, and Saturday at 5:00 p.m., with Joshua to initiate the video calls.

On January 6, 2023, an order on adequate cause on the petition to modify the parenting plan was filed. It was noted that an adequate cause hearing was held on August 11, 2022, with review on August 25, 2022, and that the deadline for a response had passed, such that a full hearing or trial would be set.

On March 1, 2023, Rachelle filed a motion for a temporary family law order requesting child support, to be held harmless from debt, and to be reimbursed for garnishment, as well as the payment of attorney fees. Joshua filed a declaration relative to his finances.

On March 22, 2023, the court issued a temporary child support order, setting the amount of child support Joshua was to pay, as well as Joshua being ordered to pay Rachelle's attorney fees and costs. The court additionally entered a money judgment against Joshua, requiring him to reimburse Rachelle for debt as set forth in the final divorce order entered August 19, 2020.

The parties attended mediation in December 2023, but failed to reach a settlement.

In December 2023, Rachelle brought a motion for contempt relative to the court's March 2023 order stating that Joshua had not made any child support payments nor had he paid the ordered attorney fees and garnishment reimbursement. Joshua filed a declaration challenging what was ordered in March 2023, with statements like, "I do not agree to pay . . . ." CP at 285. Joshua was held in contempt and ordered to pay past due child support with interest, a civil penalty, Rachelle's attorney fees and costs with interest, and the previously ordered garnishment reimbursement with interest.

A bench trial on the modification petition was held on March 27, 2024, with Rachelle appearing through counsel, and Joshua participating pro se. Joshua, Rachelle, and Rachelle's mother testified.

Rachelle's mother, Renee Rottacker, provides daycare services for the children and offered testimony in this context. After Joshua moved out of state, his relationship with his children and Rachelle became tense, with Joshua arguing about the parenting plan. When living out of state, he did not visit the girls, except once on Independence Day. Rottacker recounted receiving a phone call from Joshua in which he stated the person he had moved in with had thrown all his and the children's things on the sidewalk and would not let him in. Joshua was arrested and spent the night in jail. Joshua told Rottacker he had no place to live and was going to sleep in his car and "would be doing day visits with the girls when it was his turn to see them." CP at 355. Joshua made the

request of Rottacker that she help his daughters make a video stating they wanted to live with him.

Rottacker described the October 2022 incident in which she was preparing the girls for a trip to Walla Walla. She testified Joshua sent her a text stating he was exercising his right to visitation, showed up at her house, and pounded on the door for a long time because she refused to let him in, resulting in Rottacker's call to the police. Following that incident and in conformance with the temporary parenting plan put in place, Joshua had regularly scheduled Zoom calls with the girls that Rottacker supervised. She related an incident in which Joshua showed up unannounced at a cheer event causing both girls to want to leave. Security intervened when Joshua got his phone out to record his commentary that Rachelle was preventing him from seeing his girls with one daughter yelling and the other daughter upset. On cross-examination, Rottacker agreed that her son, who lives with her, was ordered to stop interacting with the children because he spoke poorly of Joshua. She also testified that she believed the girls wanted a relationship with both parents, that she thought Joshua wanted the best for Rachelle and their family, and that both Joshua and Rachelle were capable of coparenting. Rottacker also described an incident in which Joshua had his hands on Rachelle's shoulders and was angry and red-faced such that Rottacker had to intervene.

Joshua testified he was currently living in Tacoma. He admitted that he still had not paid any child support. He moved away in May 2022 to Arizona, and then moved to Texas, but returned to Spokane. He claimed he was wrongfully arrested relative to a domestic violence incident, which resulted in him not having a house, but asserted that the case was dropped. He then left Spokane to move to Tacoma to live with his sister. He agreed that he was ordered to complete a psychological evaluation. He questioned whether he had to complete a domestic violence perpetrator evaluation, but thought this was done. He had a different version of events for the October 2022 incident but did not disagree that he pounded on the door. Joshua agreed that in his Zoom calls, he did ask his children if they wanted to see him, which he did because he thought Rachelle and her mother were manipulating the girls. He did know that one of his daughters would not speak to him because he missed a Zoom call and would not apologize for missing this call.

Rachelle testified that her relationship with Joshua after entry of the agreed parenting plan in 2020 was "like a rollercoaster ride" with "[a] lot of up and down and all over the place depending on moods and what was happening." CP at 491. She testified about the bases for her allegations of domestic violence, emotional or physical problems, and abusive of use of conflict, and that these were the result of her "own personal interactions with [Joshua] over the years," his "repetitive behaviors," his "[a]ggressive,

16

combative behavior, harassment, psychological abuse and manipulation," and the

incident at her mother's house on October 21, 2022. CP at 532, 546. She agreed that

when the October 21, 2022, incident occurred, it was Joshua's court-ordered visitation

weekend.

> Q.      Okay. And what would be harassing behavior that would
> prompt you to block [Joshua]?
> A.      200 phone calls while I'm working, back to back messages to
> the point where my phone was completely unusable otherwise. I would just
> turn it off because it served no other purpose. A lot of really rude
> comments.

CP at 492-93.

Rachelle testified that although Joshua had completed the mental health

evaluation, this was done without her collateral input, which was ordered. To her

knowledge, Joshua never completed the court-ordered domestic violence evaluation.

Joshua missed Zoom calls with his children and "the girls kind of took that personally as

an insult that he just chose not to see them." CP at 522. Rachelle also described that

Joshua would take funds off and on from a Greenlight card he had given his daughters

depending on whether they spoke to him. On cross-examination by Joshua, Rachelle

described her concerns about Joshua's behavior and how that related to their children:

> Q.      . . . In your own words, what are your fears about me being
> with the children unsupervised?
> A.      You don't think anything applies to you. You have no
> accountability. Any court order you're given you don't follow. You tell

17

them that you can go anywhere you want and you use that to try and get away with intimidating people, especially me. You yell and scream in front of them and to them. And I don't know what that looks like when I'm not around to make sure that it doesn't escalate.

Q. Do you—

A. You don't give people space. I used to get cornered in rooms where you would yell at me and I wasn't allowed to leave the house. I don't want that happening to them.

. . . .

A. My fear is history repeating how you treated me could be an absolute determinate of how you would treat them in the future and I've seen it happen. The supervised visit—

Q. Do you have any—

A. —got canceled—

THE COURT: Let her—I know she paused, but let her finish. Go ahead.

A. The supervised visit was ended because you cornered [one of your daughters in] a cubby.

CP at 552-53. Rachelle wanted Joshua to have supervised visits only with the girls to make sure he did not yell at them like he had in the past because he had no accountability and did not follow court orders. Rachelle testified she did believe it could be possible to effectively coparent in the future if Joshua's behavior changed and he complied with court orders.

Joshua testified about his construction company and finances. He stated he did not have a problem paying a set amount for child support. He denied any domestic violence. Joshua testified that he wanted what was in the best interests of Rachelle and his children, he wanted to go to reunification therapy, and he had been seeing a therapist himself. He

18

stated he had a great relationship with his daughters prior to moving out of state and believed his strained relationship with them since this occurred was caused by both Rachelle's attempts to alienate him from his children, as well as his own financial struggles. Joshua additionally expressed his frustration with Rachelle's refusal to communicate with him. When Joshua moved out of Spokane in May 2022, he claimed to have entered into a verbal agreement with Rachelle about letting their daughters visit him for two weeks in the summer, but that Rachelle changed her mind and would not let him see their daughters. Joshua expressed his desire to remain in his children's lives.

As to the court-ordered evaluations, Joshua testified he completed the psychological evaluation in May 2023 but was not sure if that covered the domestic violence evaluation. As to the October 21, 2022, incident, he admitted it occurred and he refused to leave but stated he had only wanted to see his children on his court-ordered visitation schedule, and that he was only there for 5 or 10 minutes. The last time he saw his daughters was during a supervised visit, at which time he had left to get his dog out of his car, and the visit ended after 5 minutes when his daughter stated she wished to end the visit. He denied that he had cornered his daughter in a cubby. Joshua expressed his willingness to do "whatever it takes" to have visitation with his daughters. CP at 561. Joshua also testified that he had been wrongly arrested based on domestic violence

charges filed by his former roommate and a restraining order might have been entered against him, but any related charges had eventually been dropped.

On April 9, 2024, the superior court sent a letter to the parties with its findings and ruling and supplemented with a letter filed on April 10, 2024, with additional findings and rulings, with the modified parenting plan and final order and findings filed on June 7, 2024. The court "found both parties to be credible except that Joshua Johnson was less credible in regards to his income and Rachelle Johnson and Renee Rottacker were less credible in regards to domestic violence related issues." CP at 309.

On April 10, 2024, the court issued its findings as to the parenting plan. The court approved major and minor modifications upon the finding that these changes were in the "children's best interest" and that there had been "a substantial change in the children's situation or in the situation of the parent who did not request the major change." CP at 621. The court approved the major change because "[t]he children are living in one parent's home with the other parent's permission," contrary to the original parenting plan, and "[t]he children's living situation is harmful to their physical, mental, or emotional health." CP at 621. The court approved the minor change because "[t]he current parenting/custody order is difficult to follow because the parent who has less residential time with the children has moved." CP at 621. However, the court declined to place limitations on Joshua pursuant to RCW 26.09.191, finding neither parent had committed

20

domestic violence nor had other problems that harmed the children's best interests. The court noted the temporary orders had required Joshua to engage in mental health and domestic violence evaluations, with this order not being complied with, but noted that the original final parenting plan did not include evaluation requirements.

Under the modified plan, the parties maintained joint decision-making for education, extra-curricular activities, and nonemergent healthcare, "but given the distance between the parties and the past history of conflict in communication," Rachelle was entitled to "choose new health and dental providers and extra-curricular activities" upon notice to Joshua. CP at 314. In addition, the court prohibited the parties from "disparag[ing] the other to the children," and ordered the parties to continue using the family communications application to communicate about the children, "but neither party shall criticize the other, cast aspersions on them or argue beyond making a specific request, explaining why they are making the request and providing an answer to the request." CP at 315. Further, "[n]either party shall threaten the other party with litigation during the communication, but there is no restriction on pursuing litigation if a request is inappropriately refused." CP at 315. Under the new plan, Joshua was required to pay Rachelle child support, and the parties must attempt to resolve disputes through mediation. The court additionally provided that Joshua may participate in counseling with

one or both of the children, with their consent, and must allow Rachelle to provide collateral information to the counselor.

As to the children's residential schedule, Rachelle remained the custodian. However, Joshua's visitation time was changed. The children were to live with Rachelle, except as follows: on three-day holiday weekends, the week of the children's spring break, Juneteenth, every other year for Thanksgiving and the children's winter break, for two weeks in July and two weeks in August with notice, and on Father's Day weekend, Joshua is entitled to visit the children in Spokane. The transportation arrangements were also modified, providing the children must be exchanged for parenting time in Ellensburg, Washington.

On June 7, 2024, Rachelle filed a motion for contempt and motion to enforce temporary orders as Joshua continued to not pay child support.

On June 7, 2024, Rachelle timely appealed.

## ANALYSIS

On appeal, Rachelle argues the trial court abused its discretion in not deciding substantial evidence supported findings of domestic violence, abusive use of conflict, or that Joshua had an emotional or physical problem preventing him from parenting, pursuant to RCW 26.09.191, such that parental limitations would be imposed. Joshua has not participated in this appeal.

Specifically, Rachelle argues that: (1) the evidence before the trial court substantiated her request for parental restrictions and limitations under former RCW 26.09.191(2)(a)(iii) (2019), based on a history of domestic violence by Joshua, (2) the evidence before the trial court substantiated her request for restrictions and limitations under former RCW 26.09.191(3)(b), based on a long-term emotional or physical problem that interfered with Joshua's ability to perform parenting functions, and (3) the evidence before the trial court substantiated her request for restrictions and limitations under former RCW 26.09.191(3)(e), that the abusive use of conflict created a serious danger to the children's psychological development. Rachelle additionally assigned 12 points of error committed by the trial court relative to her requested limitations on Joshua's residential time pursuant to RCW 26.09.191, that the trial court did not order.

The trial court did not limit Joshua's parenting time pursuant to RCW 26.09.191 based on its finding that neither parent committed abandonment, neglect, child abuse, domestic violence, assault, or sex offense. Additionally, the trial court made a finding that neither parent had any other problem, such as an emotional or physical problem, that may harm the children's best interests. Knowing what evidence the trial court used to make these findings is limited in that the trial court only articulated that it "found both

parties to be credible except that . . . Rachelle Johnson and Renee Rottacker were less credible in regards to domestic violence related issues." CP at 309.

"In matters dealing with the best interests of children, a trial court enjoys the great advantage of personally observing the parties." *In re Marriage of Timmons*, 94 Wn.2d 594, 600, 617 P.2d 1032 (1980). Following a bench trial, the trial court's findings of fact are reviewed for substantial evidence and conclusions of law are reviewed de novo. "Substantial evidence" requires the determination of whether evidence is "sufficient to persuade a rational, fair-minded person of the truth of the finding." *In re Est. of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). On review, "[w]e do not review the trial court's credibility determinations or weigh conflicting evidence 'even though we may disagree with the trial court in either regard.'" *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 740, 513 P.2d 831 (1973)). "Appellate courts are not suited for, and therefore not in the business of, weighing and balancing competing evidence." *Renz v. Spokane Eye Clinic, PS*, 114 Wn. App. 611, 623, 60 P.3d 106 (2002). Rather, we review the evidence and all reasonable inferences in the light most favorable to the prevailing party. *In re Marriage of Zigler*, 154 Wn. App. 803, 812, 226 P.3d 202 (2010). "If there is substantial evidence to support a finding, it does not matter if there is contradictory evidence in the record." *In re Custody of S.A.-M.*, 17 Wn. App. 2d 939, 952, 489 P.3d 259 (2021). Conclusions of law

are reviewed de novo to consider whether they are supported by the trial court's findings. *Littlefair v. Schulze*, 169 Wn. App. 659, 664, 278 P.3d 218 (2012).

Findings should be sufficient to identify the conflicting contentions and resolve the material issues of fact. *City of Walla Walla v. $401,333.44*, 164 Wn. App. 236, 254, 262 P.3d 1239 (2011). "While the degree of particularity required in findings of fact depends on the circumstances of the particular case, they should at least be sufficient to indicate the factual bases for the ultimate conclusions." *Id.* As a preliminary matter, the trial court's findings and conclusions are based on credibility determinations. The trial court was not specific as to what testimony or which evidence it found credible, or what it found not credible. The trial court did not make a generalized determination that one party was credible and the other party was not. The trial court did not address the specific evidence, such as which specific parts of Rachelle's declaration or trial testimony formed the basis for why it found Rachelle and her mother less credible with regard to "domestic violence related issues." CP at 309. Without such specificity, an adequate review of whether substantial evidence supports the court's findings and conclusions is hampered. However, because the record in this case contains competing and conflicting testimony and evidence, in which Rachelle presented allegations and Joshua countered with denials and/or counterpoints, we are constrained to affirm the trial court, even though we may disagree with its determinations.

25

*Domestic violence*

Under former RCW 26.09.191(2)(a), a parent's residential time with their child "shall be limited" if the court finds the parent engaged in "a history of acts of domestic violence as defined in RCW 7.105.010." The definition of "domestic violence" includes "[p]hysical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault," "coercive control," or "unlawful harassment" by another intimate partner or by one family or household member to another family or household member. Former RCW 7.105.010(9)(a), (b) (2022). In *Rodriguez v. Zavala*, our Supreme Court held that a child's exposure to domestic violence against another family member, either directly or indirectly, constituted domestic violence. 188 Wn.2d 586, 597-98, 398 P.3d 1071 (2017).

Rachelle presented evidence that Joshua committed domestic violence by inflicting fear of harm on the children during the October 21, 2022, incident, and when he cornered one of his daughters during a supervised visit. The trial court found Joshua's testimony more credible than Rachelle's and her mother's. On appeal, Rachelle asks this court to reweigh the evidence. On review, we will not make determinations on credibility.

Under RCW 7.105.010(4)(a), "coercive control" is defined as "a pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose or effect unreasonably interferes with a person's free will and

26

personal liberty." This includes intimidation or controlling conduct by damaging, destroying, or threatening to damage or destroy, or forcing the other party to relinquish goods, property, or items of special value. RCW 7.105.010(4)(a)(i)(A). Here, Rachelle presented evidence that included messaging between Joshua and her in which Joshua admitted that he withheld money from his daughters unless they talked to him. In reviewing the presented evidence, the trial court did not find these claims rose to the level of Joshua unreasonably interfering with his daughters' or with Rachelle's free will and personal liberties such that the actions constituted intimidating or controlling conduct.

The definition of "coercive control" also includes depriving the other party of basic necessities or committing other forms of financial exploitation. RCW 7.105.010(4)(a)(iii). Here, while Joshua failed, consistently and persistently, to pay child support, the evidence does not conclusively show that by not paying child support, Joshua deprived Rachelle or his daughters of basic necessities or that he was financially exploiting Rachelle such that no reasonable person would rule contrary to how the trial court ruled.

The definition of "coercive control" also includes engaging in vexatious or abusive litigation against the other party "to harass, coerce, or control the other party, to diminish or exhaust the other party's financial resources, or to compromise the other party's employment or housing." RCW 7.105.010(4)(a)(v). Vexatious or abusive

27

litigation applies where the opposing parties had an intimate relationship, the party filing

or continuing the litigation has been found by a court to have committed domestic

violence against the other party pursuant to, as relevant here, a parenting plan with

restrictions based on former RCW 26.09.l91(2)(a)(iii), and the litigation is being initiated,

advanced, or continued for the purpose of harassment. Former RCW 26.51.020(1) (2021).

Here, while Rachelle presented evidence of messaging in which Joshua commented on

litigation and the costs associated with the same, Joshua was not the party filing or

continuing the litigation. Substantial evidence was presented to support the trial court's

finding that Joshua was not engaged in abusive use of conflict.

*Emotional or physical impairment*

Under former RCW 26.09.191(3), the court "may" preclude or limit any provision

of the parenting plan if the parent is found to have a long-term emotional or physical

problem that interferes with "parenting functions" as defined in RCW 26.09.004. Under

the statute, "parenting functions" are defined as "those aspects of the parent-child

relationship in which the parent makes decisions and performs functions necessary for the

care and growth of the child," including:

> (a) Maintaining a loving, stable, consistent, and nurturing relationship
> with the child;
> (b) Attending to the daily needs of the child, such as feeding, clothing,
> physical care and grooming, supervision, health care, and day care, and
> engaging in other activities which are appropriate to the developmental

level of the child and that are within the social and economic circumstances of the particular family;

(c) Attending to adequate education for the child, including remedial or other education essential to the best interests of the child;

(d) Assisting the child in developing and maintaining appropriate interpersonal relationships;

(e) Exercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances; and

(f) Providing for the financial support of the child.

RCW 26.09.004(2).

Rachelle's arguments center around the claim that Joshua did not perform parenting functions listed in RCW 26.09.004(2). Substantial evidence was presented, however, to support the trial court's finding that Joshua did not have a long-term emotional or physical impairment that interfered with his ability to parent.

*Abusive use of conflict*

Under former RCW 26.09.191(3)(e), the court may impose any restrictions or remedies if the court finds "abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development." The definition of "abusive use of conflict" includes, but is not limited to, abusive litigation as defined in RCW 26.51.020.

Here, although Rachelle presented written communications from Joshua and threats to utilize litigation to obstruct or financially inhibit her, substantial evidence was

No. 40489-7-III
*In re Marriage of Johnson*

presented to support the trial court's finding that Joshua was not engaged in abusive use of conflict.

*Limitations on parenting time*

Because substantial evidence supports the trial court's findings that there was no domestic violence, no long-term emotional or physical problem affecting Joshua's parenting, or no abusive use of conflict, the trial court did not abuse its discretion in declining to place RCW 26.09.191 preclusions or limitations on Joshua.

## CONCLUSION

We affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Murphy, J.

I CONCUR:

Fearing, J.

30

No. 40489-7-III

LAWRENCE-BERREY, C.J. (concurring) — This result does not sit well with me. I concur because our review of trial court decisions in these types of matters is very deferential. Our affirmance of the trial court should not be construed as our agreement with it.

Lawrence-Berrey, C.J.